**Opinion issued January 12, 2017**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-16-00239-CV
_____

**MICHAEL HOSPADALES AND LOOMIS ARMORED US, LLC, Appellants**

**V.**

**ROY MCCOY, Appellee**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-57960**

---

## O P I N I O N

In this motor-vehicle-accident case, Michael Hospadales and Loomis Armored US, LLC, appeal a judgment based on a jury verdict, awarding Roy McCoy damages for past medical expenses, past lost earning capacity, and past pain and suffering, totaling $292,000. Raising five issues, Hospadales and Loomis

contend (1) the evidence was legally insufficient to show that the accident caused McCoy's injuries; (2) the trial court erred by admitting McCoy's medical records and bills into evidence; (3) the evidence was legally and factually insufficient to support the jury's award of past lost earning capacity; (4) the evidence was legally and factually insufficient to support the jury's awards for past medical expenses and for pain and suffering; and (5) the evidence was factually insufficient to support the jury's finding that McCoy was not contributorily negligent.

We conclude that the evidence was legally and factually sufficient to support the jury's verdict, and the trial court properly exercised its discretion in making its evidentiary rulings. Therefore, we affirm the trial court's judgment.

## Background

To earn a living, Roy McCoy transports cars from one location to another using a 30-foot articulated trailer, pulled by a pickup truck. On January 4, 2013, McCoy and his wife were traveling north on Interstate 45 on their way to pick up a car from an auction. McCoy was driving the truck and pulling the trailer in the second lane from the median wall. Also on the freeway that day was Michael Hospadales, who was driving an armored truck for his employer, Loomis Armored US, LLC.

The armored truck was equipped with a monitoring system, including a video camera that filmed the view of the road in front of the armored truck and

some of its periphery. The monitoring system also recorded data related to Hospadales's operation of the vehicle. This data included the vehicle's speed, its longitudinal acceleration and deceleration, and its side-to-side movement. The monitoring system also recorded when Hospadales applied his brakes and when an impact with the vehicle occurred.

The video taken that day of the road in front of the armored vehicle shows that Hospadales was driving behind McCoy in the same lane. Hospadales changed lanes, moving to the left, innermost lane on the freeway. After he changed lanes, Hospadales's speed increased to 68 miles per hour, eight miles an hour over the speed limit. Hospadales was traveling faster than McCoy, and Hospadales proceeded to pass McCoy on McCoy's left. As Hospadales approached McCoy's vehicle, the video shows that the left side tires of McCoy's truck and trailer were on the white line between the lanes, but neither McCoy's truck nor the trailer appears to cross the line or leave McCoy's lane. At that point, Hospadales moved toward the shoulder of the road, which was on Hospadales's left. Hospadales continued to move past McCoy's trailer. The video shows the tires of McCoy's truck move to the right, off the white line, back into McCoy's lane. Hospadales navigated his vehicle to the right from the shoulder. The video then shows that the brake lights of the vehicle directly in front of Hospadales were activated. The data from the monitoring system on the armored truck indicates that Hospadales applied

3

his brakes as he moved the armored truck to the right. At that point, Hospadales's vehicle entered McCoy's lane and hit the back, lower right side of McCoy's pickup truck. The impact caused McCoy's truck and trailer to jackknife and skid 500 feet. McCoy pushed hard on the brakes, and his truck and trailer came to a stop on the other side of the freeway.

McCoy was taken by ambulance to the emergency room where he complained of back pain, rating his pain an 8 out of 10. The medical records from the visit show that McCoy was diagnosed by the emergency room doctor with "[a] neck sprain, back & neck pain." The emergency room discharged McCoy to his home with medication and instructions to seek follow-up care.

Five days later, on January 9, 2013, McCoy sought care at Ultimate Choice Medical & Rehab Clinic where he was seen by Dr. G. Lagesse. McCoy's medical records from the clinic indicate that McCoy reported pain in his neck, lower back, and right knee. McCoy rated the intensity of his pain at 7 out of 10. He indicated that the pain was aggravated by walking, prolonged sitting, bending, and lifting. Under the heading "history of present illness," Dr. Lagesse wrote that McCoy had been in a motor vehicle accident and had sustained a "new" back and right knee injury. He noted that McCoy had pain in his back and neck, and McCoy reported pain and swelling of his right knee. Dr. Lagesse ordered an MRI of McCoy's

4

lower back and an x-ray of his knee. Dr. Lagesse also referred McCoy to physical therapy three times a week.

On February 26, 2013, McCoy was seen by Dr. B. Perez, who is board certified in pain management. McCoy reported to Dr. Perez that he had been in a motor vehicle accident the previous month. Under McCoy's patient history, Dr. Perez wrote that McCoy "has pain in the neck, lower back radiating to the right leg and right knee that swells up with exertion." The doctor noted that McCoy's "[p]ain is rated as 8/10 and is associated with numbness, tingling and weakness." McCoy reported that the "[p]ain is constant, throbbing with spasm, distressing and excruciating. It gets worse with lying down, walking, physical activity, working, bending, lifting, sitting, standing[.]" Dr. Perez discussed with McCoy the option of treating his back pain with epidural steroid injections but advised McCoy to continue with physical therapy.

McCoy was seen by Dr. J. White of Disability and Pain Consultants of Texas on April 23, 2013. Dr. White indicated in McCoy's medical records that McCoy had a "lumbar sprain strain injury" and a "cervical sprain strain injury (whiplash)" as a result of the motor vehicle accident that had occurred three months earlier. McCoy had indicated that pain in his lower back and knee was worsening and that he continued to have pain in his neck.

Dr. White indicated that the MRI showed McCoy had herniated discs in his neck. Among the MRI findings with regard to McCoy's lower back was an annular tear in the disc at the L5-S1 vertebrae. Dr. White also indicated that an MRI of McCoy's right knee showed that he had a torn meniscus.

Dr. White noted that McCoy had been receiving physical therapy for three months. The doctor recommended that McCoy continue physical therapy and indicated that McCoy was a candidate for cervical epidural steroid injections. Dr. White also indicated that McCoy may be referred "for orthopedic surgical assessment" regarding his torn meniscus.

McCoy attended physical therapy from January 11, 2013 to June 7, 2013; nonetheless, the pain in his neck, lower back, and knee continued. Dr. Perez gave McCoy an epidural steroid injection in his lower back on June 17, 2013 and another injection on November 3, 2013.

With regard to his knee, McCoy consulted Dr. J. Rodriguez, an orthopedic surgeon, on June 17, 2013. Dr. Rodriguez performed surgery to address the torn meniscus in McCoy's right knee on September 19, 2013. After his surgery, McCoy received physical therapy for his knee with his last treatment on October 18, 2013.

McCoy filed suit against Hospadales and Hospadales's employer, Loomis, asserting that Hospadales had negligently caused the auto accident. McCoy

6

claimed that the accident had caused injury to his back, neck, and knee. He sought damages for medical expenses, lost earning capacity, and pain and suffering.

Trial began in December 2015. Before picking the jury, the trial court conducted a hearing at which the parties pre-admitted exhibits. McCoy offered Exhibits 8 through 21, which were the medical and billing records for the treatment he had received from the various medical providers following the accident. Hospadales and Loomis (collectively, "Loomis") objected to the admittance of the billing and medical records. Loomis asserted that the records were not relevant because "there's no evidence" that McCoy's "injuries were caused by the accident." The trial court agreed with Loomis that McCoy was required to prove that the accident "gave rise to [his] injury that gave rise to the [medical] treatment." The trial court, however, admitted McCoy's medical and billing records, indicating that Loomis had preserved its relevancy objection should McCoy not meet his burden to prove causation. The trial court also pointed out that, should McCoy fail to prove causation, Loomis could move for directed verdict after McCoy rested.

During trial, Loomis defended against McCoy's claims by asserting that McCoy, not Hospadales, had caused the accident. Loomis theorized that McCoy's trailer had crossed the white line and bumped the side of the armored truck as it

passed. Loomis claimed that this caused its truck to then crash into McCoy's truck.

Loomis also asserted that the accident involved in this case had not caused McCoy's physical injuries. It claimed that McCoy's back and neck injuries were preexisting and had been caused by a 2010 car accident. Loomis pointed out that MRIs taken of McCoy's back and neck, following the 2010 accident, showed essentially the same injuries as those indicated in the MRIs taken following this accident. Loomis also asserted that the evidence was not sufficient to show that McCoy's knee injury had been caused by the accident.

To prove that Loomis had caused the accident, McCoy offered the expert opinion of Richard Tonda, a mechanical engineer experienced in accident reconstruction and vehicle design. Tonda testified that he had analyzed the accident information in this case, including the data collected at the time of the accident by the monitoring system onboard Loomis's truck. Tonda testified that, based on a reasonable degree of engineering certainty, the initial impact occurred when the Loomis truck came into McCoy's lane and struck McCoy's truck.

Tonda acknowledged that, as Hospadales approached McCoy's vehicle, which was in the lane to Hospadales's right, McCoy's tires touched the white line; however McCoy's vehicle is never seen leaving its lane. The video and the data show that Hospadales steered his truck to the left toward the shoulder. However,

8

Tonda pointed out that, as Hospadales continued to pass, McCoy's vehicle is seen moving to the right, off the white line, back into McCoy's lane. The data and the video show that Hospadales then steered his truck back to the right. Tonda noted that the driver in front of Hospadales applied his brakes. Tonda testified that the data showed that Hospadales then engaged in an "extreme brake maneuver." At that point, Hospadales's vehicle then entered McCoy's lane and struck McCoy's truck. Tonda testified, "[W]hen you make an extreme brake maneuver during a turn, it generally tends to pull you into the direction of the turn." The video taken from the Loomis truck and the data collected by the onboard monitoring system was presented to the jury during Tonda's testimony. Tonda explained, step by step, how the data, which appeared in a graph format below the video, supported his opinion. Tonda stated that the data did not support Loomis's theory that the initial impact had been McCoy's trailer striking Loomis's truck.

Tonda disagreed with Loomis's accident reconstruction expert, Dale King, who opined that McCoy had caused the accident. King testified at trial by video deposition. King theorized that McCoy's trailer had crossed the white line between the lanes and hit Loomis's truck. Although this impact could not be seen on the video captured by the onboard monitoring system, King pointed to a sound on the video that could be heard before Loomis's truck is seen entering McCoy's lane and striking his vehicle. King opined that this "metal on metal" sound was the

9

trailer hitting the armored truck. When asked about the sound, Tonda testified that, in his opinion, the sound to which King referred emanated from Hospadales's application of his brakes during the "extreme brake maneuver" Hospadales engaged in before hitting McCoy.

McCoy also testified at trial. He was adamant that his trailer never left its lane, and did not strike Loomis's truck. McCoy testified that after the armored vehicle hit the back of his truck, his vehicle jackknifed and skidded down the freeway 500 feet. McCoy testified that he pushed on his brakes "[v]ery hard. Very hard. Very hard."

McCoy acknowledged that he had injured his neck and his back in a 2010 auto accident, but he testified that he had fully recovered from those injuries. On cross-examination, McCoy stated that he had recovered from those injuries about two years before the January 2013 accident involved here.

McCoy acknowledged that he had filed an earlier lawsuit based on the 2010 accident. Loomis sought to impeach McCoy with deposition testimony he had given in that suit. The deposition had been taken in 2012, five months before the January 2013 accident involved here. In the deposition, McCoy had testified that he still had back pain. At trial, McCoy stated that he did not remember giving that testimony and indicated that he did not believe he had back pain at the time of the deposition. On re-direct examination, McCoy clarified: "At the time of the

[January 2013] accident, I was fine. Whether it was two months, three months, six months, the question was I was fine." McCoy also testified that his knee was not injured before the 2013 accident.

To prove that the 2013 accident had caused the personal injuries alleged in this suit, McCoy offered the testimony of Dr. Rodriguez, the orthopedic surgeon who performed McCoy's knee surgery. Pretrial, Loomis had filed a motion to strike McCoy's experts. In the motion, Loomis had asserted that McCoy's "designated experts are not qualified to express an opinion regarding the causal link between the accident and [McCoy's] injuries and damages, and such experts have no reliable basis on which to base any opinion regarding the causal link between [McCoy's] medical conditions and the accident."

During trial, immediately before Dr. Rodriguez testified, the trial court conducted a hearing on Loomis's motion to strike McCoy's experts, specifically, its request to strike Dr. Rodriguez. Regarding the motion, the following exchange occurred:

> THE COURT: You do intend to call Dr. Rodriguez to give his testimony that the incident—the accident made the basis of this suit caused the injuries made the basis of this suit; is that right?
>
> [McCoy's counsel]: Yes.
>
> THE COURT: Okay. And so all you've said generically is that they [sic] don't have the qualifications to do so. What do I do with that? How do they [sic] not have the qualification to do so?

11

[Loomis's counsel]: The question of causation is a separate analysis from diagnosis in treatment. Simply being qualified as a medical doctor doesn't necessarily qualify one to testify about a causal link unless they have done the appropriate study with respect what causes what.

THE COURT: So what would the study that would have been done in this particular case? I mean is it all injuries made the basis of this? You have a very general motion.

[Loomis's counsel]: I know.

THE COURT: . . . I am asking you to get to the meat of it.

[Loomis's counsel]: All right. The meat is there's no reliable scientific basis to say that this type of an accident causes the injuries that they are complaining of, specifically, . . . disc problems, which—and it's because of the disc problems that they did the injections.

THE COURT: Okay. So and is that the body of what we should focus on for this hearing? That is what I want to know.

[Loomis's counsel]: I think so.

THE COURT: Okay. So what qualifications—well, first of all, will your doctor take the stand and be asked and express the opinion about within a reasonable degree of probability whether the—the accident the—the vehicle accident caused this disc issue?

[McCoy's counsel]: Yes.

THE COURT: Okay. So what will he say the basis of it is? I need a little fill in here.

[McCoy's counsel]: Sure. Dr. Rodriguez, Your Honor, is a board certified orthopedic surgeon. He's a whole body orthopedic surgeon. Dr. Rodriguez has reviewed every record in this case. He's reviewed all of Mr. McCoy's prior medical records from 2010 and from 2000—going all the way back to 2002. He has formed an expert opinion

12

based on his review of all of those records, based upon his treatment of Mr. McCoy as related to his knee injury that didn't exist in any—

THE COURT: We are talking about the disc injury?

[McCoy's counsel]: Right.

THE COURT: That's what I've understood.

[Loomis's counsel]: But I do need to include knee. Can I just suggest something that may—I know I filed a motion. I don't want to completely—I do not want to waive the challenge.

(Discussion off the record).

(Jury not present)

THE COURT: We're back on the record. . . . I have a suggestion and so I'm going announce it and you can tell me. Look what I believe I'm going to do right now is deny that motion. You are going to be able to fully cross-examine all these issues. You will be able to reurge all or part of that, once it's there. I am going to be able to tell the jury, instruct the jury to disregard if we need but you've filed the motion. You've filed a response. You opposed it obviously, right?

[McCoy's counsel]: Yes, Judge.

THE COURT: The motion is denied.

[Loomis's counsel]: Well, I appreciate that, Judge. I really don't want to waive the motion.

THE COURT: I don't want you to waive it all. [Y]ou've not waived it.

[Loomis's counsel]: Okay. That's my concern is that I—if he takes the stand, I don't want to waive my right to cross examine him on—

THE COURT: You may cross-examine fully on the same issues, but I am denying it at this time. . . .

As will be discussed more fully *infra*, Dr. Rodriguez testified that, based on a reasonable medical probability, the January 2013 accident caused injury to McCoy's lower back, neck, and knee. He also testified that the medical expenses for the treatment McCoy received post-accident were reasonable and necessary.

The jury was asked, "Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury answered "Yes" for Hospadales and "No" for McCoy. The jury awarded McCoy $92,000 for past medical care expenses, $40,000 for past loss of earning capacity, and $160,000 for past pain and suffering. The trial court rendered judgment on the jury's verdict awarding McCoy $292,000 in damages. This appeal followed in which Loomis identifies five issues.

## Sufficiency of the Evidence

In four of its issues, Loomis challenges the legal and factual sufficiency of the evidence to support the jury's findings.

### A. Standards of Review

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the

14

only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* at 827.

In a factual sufficiency review, we consider and weigh all of the evidence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). When the appellant challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When it challenges an adverse finding on an issue on which it had the burden of proof at trial, the appellant must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Grider v. Mike O'Brien, P.C.*, 260 S.W.3d 49, 57 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

**B.      Causation**

In its first issue, Loomis asserts that the evidence was legally insufficient to support the award of damages because there was no evidence that the 2013 accident caused McCoy's personal injuries.  Loomis contends that Dr. Rodriguez's expert testimony cannot support the causation finding.  Loomis asserts that Dr. Rodriguez was not qualified to give an expert opinion testimony on causation, and his causation testimony was unreliable.

The party offering the expert's testimony bears the burden of establishing that the witness is qualified as an expert.  *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996).  The offering party must show that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on the particular subject.  *Id.* at 153.

Here, Loomis asserts that Dr. Rodriguez was not qualified to render an opinion that the accident caused injury to McCoy's lower back, neck, and knee.  Typically, a challenge that an expert was not qualified to render an opinion would not be raised as part of a sufficiency-of-the-evidence review; rather, a challenge to the qualifications of an expert would be raised in the context of determining whether the expert's testimony was admissible.  *See E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) (holding that, in

accordance with Rule of Evidence 702, expert testimony is admissible if (1) expert is qualified and (2) testimony is relevant and based on a reliable foundation).

Here, the trial court denied Loomis's motion to strike Dr. Rodriguez's testimony based upon the argument of counsel at the hearing preceding Dr. Rodriguez's testimony. The trial court did not hear evidence at that time regarding Dr. Rodriguez's qualifications or the reliability of his testimony. However, the trial court indicated that such evidence would be heard and considered during Dr. Rodriguez's testimony.[1] In this regard, the trial court made clear that McCoy still needed to demonstrate that Dr. Rodriguez was qualified and that his testimony was based on a reliable foundation. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006) ("[T]he party sponsoring the expert bears the burden of showing the expert's testimony is admissible[.]"). Moreover, McCoy's objection to Dr. Rodriguez's qualifications in this case were intertwined with his objection that Dr. Rodriguez's opinion was unreliable and conclusory, making the complaint one addressing the substance of the testimony. *Cf. Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 105 n.6 (Tex. App.—Dallas 2010, pet. denied) ("The case law demonstrates an objection is one addressing the substance of the testimony when

---

[1]  The trial court told Loomis that it could reurge its motion to strike Dr. Rodriguez's testimony after the doctor had testified. The trial court assured Loomis that its objection to Dr. Rodriguez's testimony had not been waived. Loomis did not reurge the objection after Dr. Rodriguez testified. Nonetheless, under the circumstances of this case, we address Loomis's complaints as part of our sufficiency-of-the evidence review.

the objection to the insufficiency of the expert's qualifications is combined with an objection that the expert's opinion is conclusory.") (citing *Yancy v. United Surgical Partners Int'l, Inc.,* 170 S.W.3d 185, 191 (Tex. App.—Dallas 2005), *aff'd,* 236 S.W.3d 778 (Tex. 2007) (holding objections that expert witnesses "were not qualified to testify regarding [patient's] condition and their statements were nothing more than unsupported conclusions" went to substance of affidavits and could be raised on appeal)).  Given the unique posture of this case, we will address, as part of the sufficiency review, whether McCoy offered adequate evidence to show Dr. Rodriguez was qualified to render his expert opinion.

At trial, Dr. Rodriguez testified that he is a board certified orthopedic surgeon with a subspecialty in the spine and has been practicing in that field for 27 years.  He stated that, although his subspecialty is the spine, he also practices general orthopedics.  Dr. Rodriguez testified that, after examining McCoy and reviewing the MRI of McCoy's knee, he performed arthroscopic surgery on McCoy's knee to repair his torn meniscus.

When asked whether he had "any kind of special knowledge or training or skills in order to determine causation of an injury," Dr. Rodriguez responded that "as part of the orthopedic specialty you need to understand how the different injuries take place."  Dr. Rodriguez indicated that an orthopedic specialist uses his knowledge of physics to determine whether the injury suffered could have been

caused by the event reported. Dr. Rodriguez stated that the event being reported by a patient as having caused the injury must correlate with the physical finding of the injuries sustained by the patient. In other words, Dr. Rodriguez's testimony indicated that, as an orthopedic surgeon, he must understand how an injury was caused in order to treat it. Thus, Dr. Rodriguez's testimony showed that he had knowledge, skill, experience, training, and education regarding causation of back, neck, and knee injuries, qualifying him to give an opinion on the causation of McCoy's injuries. *See Abilene Indep. Sch. Dist. v. Marks*, 261 S.W.3d 262, 271 (Tex. App.—Eastland 2008, no pet.) (holding, in worker's compensation case, that orthopedic surgeon was qualified to testify that teacher's knee injury was caused by student kicking teacher in knee); *LMC Complete Automotive, Inc. v. Burke*, 229 S.W.3d 469, 479 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (indicating, in case in which orthopedic surgeon testified that plaintiff's back injuries were caused by on-the-job accident, that injuries were within realm of orthopedic surgeon's expertise); *cf. Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998) (holding, in products liability case involving automobile, that district court did not abuse its discretion by excluding mechanical engineer's testimony because expert did not have specific experience regarding subject matter of lawsuit); *Broders*, 924 S.W.2d at 149 (holding that district court did not abuse its discretion by excluding expert's opinion on causation, although expert plainly

had greater knowledge of medicine generally than lay person, he did not have specialized knowledge on precise subject of causation).

Loomis also asserts that Dr. Rodriguez's testimony regarding causation did not have a reliable basis. To establish causation in a personal injury case, a plaintiff must prove the defendant's conduct caused an event, and that event caused the plaintiff to suffer compensable damages. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). The causal link between the event sued upon and the plaintiff's injury must be shown by competent evidence. *Guevara v. Ferrer*, 247 S.W.3d 662, 666 (Tex. 2007). When a plaintiff claims damages for a medical condition, the cause of which is not within the common knowledge and experience of jurors, expert testimony is necessary to show the defendant's conduct caused that condition. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015).

The causal connection between a defendant's negligence and a plaintiff's injuries cannot be based on mere conjecture, speculation, or possibility. *See Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). To constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability. *Crye*, 907 S.W.2d at 500; *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). However, a plaintiff, "is not required to establish causation in terms of medical certainty nor is

he . . . required to exclude every other reasonable hypothesis." *Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied). "Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase." *Thompson v. Stolar*, 458 S.W.3d 46, 57 (Tex. App.—El Paso 2014, no pet.) (citing *Crye*, 907 S.W.2d at 500).

"Under a legal-sufficiency analysis, an expert's opinion may constitute no more than a mere scintilla of evidence if the opinion is not reliable under the same standards that govern admissibility, is speculative or conclusory on its face, or assumes facts contrary to the undisputed facts." *Gunn v. McCoy*, 489 S.W.3d 75, 84–85 (Tex. App.—Houston [14th Dist.] 2016, pet. filed) (citing, inter alia, *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (considering legal-sufficiency challenge to expert opinion because opinion was alleged to be "conclusory or speculative and therefore non-probative on its face"); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (considering legal-sufficiency challenge regarding expert opinion under *Daubert* and *Robinson* reliability standards for rule 702 admissibility)).

In determining whether expert testimony is reliable, we review an expert's testimony in its entirety and will not accept the expert's opinion as some evidence

"'simply because he used the magic words.'" *Havner*, 953 S.W.2d at 711–12 (quoting *Schaefer v. Tex. Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–04 (Tex. 1980)). Instead, "[a]n expert must base his opinion on facts or data perceived or reviewed during or before trial." *LMC Complete Automotive*, 229 S.W.3d at 478 (citing TEX. R. EVID. 703; *Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.—Houston [1st Dist.] 1995, no writ)). An expert's opinion regarding causation based completely upon speculation and surmise amounts to no evidence. *Id.* (citing *Schaefer*, 612 S.W.2d at 204–05. "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Havner*, 953 S.W.2d at 714. Expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 727. In short, "'there must be some basis for the opinion offered to show its reliability.'" *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006) (quoting *Gammill*, 972 S.W.2d at 726).

Dr. Rodriguez testified that he had examined McCoy and reviewed the MRI film of McCoy's knee, which revealed that McCoy had a lateral meniscus tear of the right knee. Dr. Rodriguez treated the meniscal tear by performing arthroscopic surgery on McCoy's knee. Dr. Rodriguez testified that McCoy had described to him what had occurred during the accident. Dr. Rodriguez indicated that McCoy

22

had told him that he injured his knee in the course of attempting to stop his vehicle during the accident. Dr. Rodriguez also indicated that, from McCoy's description of the accident, it "makes sense" that McCoy's injury resulted from the accident. Dr. Rodriguez testified that, based upon a reasonable degree of medical probability, the tear to McCoy's meniscus in his knee was caused by the 2013 accident.

Dr. Rodriguez's testimony indicated that his causation opinion regarding McCoy's knee injury was based on McCoy's description of the accident, his physical examination of McCoy, and the MRI of McCoy's knee. This is competent evidence demonstrating that Dr. Rodriguez's causation opinion was sufficiently reliable to support the jury's negligence finding. *See Gammill*, 972 S.W.2d at 727; *Robinson*, 923 S.W.2d at 557; *see also LMC Complete Automotive*, 229 S.W.3d at 479 (holding that orthopedic surgeon's causation opinion was reliable when based on patient history given by plaintiff, coupled with medical tests and physical examination).

Dr. Rodriguez also testified that, based on a reasonable degree of medical probability, the 2013 accident aggravated McCoy's preexisting injuries in his lower back and neck. To arrive at this conclusion, Dr. Rodriguez reviewed McCoy's past medical records relating to his back and neck injuries. These included the MRI report related to the back and neck injuries McCoy sustained in

the 2010 accident. Dr. Rodriguez acknowledged that the MRI findings from 2013 indicated nearly the same injuries as the 2010 MRI. However, Dr. Rodriguez explained that "we don't treat MRIs." He continued, "The MRIs are done to help us rule out problems or be assertive of diagnosis, but we always treat the patient." Dr. Rodriguez testified that McCoy was "asymptomatic before this accident and his symptoms are the ones that objectively indicates that he has an aggravation of a previous injury based on the MRIs." In other words, Dr. Rodriguez testified that, while MRIs are used as a diagnostic tool, what the patient reports is also important in diagnosing and treating a patient.

Here, McCoy reported that, before the 2013 accident, he was no longer experiencing any back or neck problems from the 2010 accident. However, after the 2013 accident, McCoy reported experiencing back and neck pain. This indicated to Dr. Rodriguez that the report of new symptoms following the 2013 accident supports the conclusion that the accident aggravated McCoy's previous injuries from 2010.

While temporal proximity alone will not support inference of medical causation, when combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event may be probative in determining causation. *Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007). In addition to McCoy's report of new symptoms following the 2013 accident, Dr.

24

Rodriguez also testified that comparing the 2010 and 2013 MRIs also indicated that McCoy had suffered new injuries. Dr. Rodriguez stated that, while both the 2010 and 2013 MRIs indicated that McCoy had a sprained neck, the 2013 MRI showed that McCoy's neck sprain shown was worse than the neck sprain indicated in the 2010 MRI. Dr. Rodriguez also testified that the 2013 MRI showed McCoy had a posterior annular tear at the L5-S1 level in McCoy's lower back that was not present in the 2010 MRI. Dr. Rodriguez testified that, while this type of tear can be the result of natural degenerative changes, it was his opinion that the tear was caused by the 2013 accident. As mentioned, Dr. Rodriguez also testified at trial that, as an orthopedic surgeon, part of his evaluation of an injury is to determine whether the force reported as causing an injury could have actually caused it. He stated, "The injuries have to correlate with the mechanics of what caused those symptoms and injuries."

Here, in support of his causation opinion, Dr. Rodriguez's testimony showed that he relied on McCoy's report regarding his past and present symptoms and on McCoy's past and present medical records, including the past and present MRIs. Based on this information, Dr. Rodriguez evaluated whether the 2013 accident caused injury to McCoy's back and neck. Thus, Dr. Rodriguez's testimony demonstrated that his causation opinion had a reliable foundation. *See Marks*, 261 S.W.3d at 272; *LMC Complete Automotive*, 229 S.W.3d at 479; *see also City of*

*Laredo v. Limon*, No. 04–12–00616–CV, 2013 WL 5948129, at \*4 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.) (holding, in auto accident case, that treating physician's testimony that accident caused plaintiff's rotator cuff tear was not conclusory because doctor had factual basis for his opinion, specifically his examination of plaintiff and review of her medical records). We therefore hold that Dr. Rodriguez's causation testimony was legally sufficient, and sufficiently reliable to support the jury's negligence finding.[2] *See City of Keller*, 168 S.W.3d at 827; *Gammill*, 972 S.W.2d at 727; *Robinson*, 923 S.W.2d at 557.

---

[2] Dr. Rodriguez also testified that the charges for the various medical services and treatments provided to McCoy for his injured knee, neck, and back were reasonable and necessary charges. The trial court also admitted McCoy's medical records and bills from the providers. The records from each provider were accompanied by a Texas Civil Practice and Remedies Code section 18.001 affidavit. Each affidavit stated, "The service provided was necessary and the amount charged for the service was reasonable at the time and place that the service was provided." None of the affidavits were controverted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(b) (Vernon 2015). Because they were uncontroverted, the affidavits served to support the reasonableness and necessity of the charges and services provided to McCoy. *See id.* ("Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary."). We note that Loomis correctly points out that, in addition to proving reasonableness and necessity of the charges, McCoy was also required to prove causation; that is, the affidavits did not serve to prove causation. *See Figueroa v. Davis*, 318 S.W.3d 53, 61 (Tex. App.—Houston [1st Dist] 2010, no pet.) (Section 18.001 affidavits "proved only the expenses' reasonableness and necessity, not causation"). As discussed, Dr. Rodriguez's testimony provided legally sufficient causation evidence.

Lastly, Loomis complains that the trial court did not hold an evidentiary hearing on its motion to strike Dr. Rodriguez's testimony; rather, it based its ruling on the arguments of counsel. Contrary to Loomis's position, we have previously held that it is within the trial court's discretion "whether, when, and how to hold a *Robinson* hearing." *Piro v. Sarofim*, 80 S.W.3d 717, 720 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also Gomez v. Am. Honda Motor Co*., No. 04-14-00398-CV, 2015 WL 1875954, at *3 (Tex. App.—San Antonio Apr. 22, 2015, pet. denied). (mem. op.) (holding that trial court was not required to hold gatekeeper hearing). Moreover, Loomis has not shown that it was harmed by the trial court's decision to deny the motion without holding an evidentiary hearing. *See* TEX. R. APP. P. 44.1(a)(1). As discussed *infra*, McCoy sufficiently demonstrated at trial that Dr. Rodriguez was qualified to give his causation opinion and his testimony was reliable. In short, the trial court's decision not to hold a separate evidentiary hearing did not result in the rendition of an improper judgment nor did it prevent Loomis from properly presenting the case on appeal. *See id.*

We overrule Loomis's first issue.

## C.     Admission of Medical Records

As a corollary to its first issue, Loomis asserts in its second issue that the trial court erred by admitting McCoy's medical records and bills. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *In re*

*J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).  In the trial court, Loomis objected to the admission of the records on the basis that they were not relevant evidence.  *See* TEX. R. EVID. 401, 402.  Specifically, Loomis asserted that the records were not relevant because McCoy could not establish that the 2013 accident caused his injuries.  As discussed, Appellant offered sufficient evidence to establish causation. Thus, Loomis has failed to show on appeal that the trial court abused its discretion when it admitted McCoy's medical records and bills.

We overrule Loomis's second issue.

## D.     Damages for Past Medical Expenses and Past Pain in Suffering

In its fourth issue, Loomis asserts that the evidence was factually insufficient to support the jury's $92,000 award for past medical expenses and its $160,000 award for past pain and suffering.

### 1.  Past Medical Expenses

Loomis asserts that the evidence was factually insufficient to support the jury's award of past medical expenses because "the overwhelming evidence" showed that McCoy's neck and back injuries were not caused by the 2013 accident but were preexisting conditions.  In its brief, Loomis contends:

> Dr. Rodriguez testified that the disc herniation in McCoy's neck may or may not have been caused by the accident.  Further, he also testified that the MRI of McCoy's neck from 2010 done after a previous accident had the same findings as the MRI from 2013 after this accident, and that there were also no new findings in McCoy's lower back.  Finally, Dr. Rodriguez testified that the "slippage" in

28

McCoy's disc in his lower back was caused by degenerative changes, not the accident, and noted that he had had the same injections two years before that he had again after the accident.

(Record citations omitted.)

On redirect examination, Dr. Rodriguez clarified that, based on his review of the MRIs, the neck sprain suffered by McCoy caused by the 2013 accident was worse than the neck sprain he suffered following the 2010 accident. Dr. Rodriguez also testified that the 2013 MRI showed that McCoy had an annular tear in his lower back that was not shown in the 2010 MRI. Dr. Rodriguez averred that the annular tear was "the main indication to have an epidural steroid injection" in his back. Thus, while he agreed that most of the injuries seen in the 2013 MRI were the same as those present in the 2010 MRI, Dr. Rodriguez testified that McCoy also had additional neck and back injuries that were not present following the 2010 accident and were caused by the 2013 accident.

Further, Dr. Rodriguez testified that McCoy's previous injuries were aggravated by the 2013 accident. He stated that McCoy had reported that he had no pain or symptoms before the 2013 accident but developed back and neck pain after the accident. Dr. Rodriguez testified that doctors treat patients and not MRIs, indicating that treatment may be based on what a patient is reporting in addition to what is shown by an MRI.

Even though we consider and weigh all the evidence in support of and contrary to the finding in our factual-sufficiency review, it is the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When there is conflicting evidence about the severity of the injuries or about whether the injuries were caused by the collision, the jury has the discretion to resolve the conflicts. *Lanier v. E. Foundations, Inc.*, 401 S.W.3d 445, 455 (Tex. App.—Dallas 2013, no pet.). Applying the appropriate standard of review, we conclude that the jury's award of $92,000 for past medical expenses is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We hold the evidence was factually sufficient to support the award.

### 2. *Past Pain and Suffering*

Loomis also contends that the evidence was factually insufficient to support the jury's award of $160,000 for past pain and suffering.

Loomis asserts that the evidence was factually insufficient to support the pain and suffering damages because McCoy's back injuries were preexisting at the time of the 2013 accident. Loomis claims that any pain and suffering experienced by McCoy in his back after the 2013 accident arose from preexisting injuries. Loomis points out that McCoy had complained of back pain during his 2012

deposition five months before the 2013 accident. Loomis also points to evidence showing that most of the findings noted in the 2013 MRI were also present in the 2010 MRI. And Loomis calls attention to Dr. Rodriguez's testimony that the MRIs showed degenerative changes in McCoy's back, resulting from the natural aging process. However, as discussed above, Dr. Rodriguez also testified that the 2013 accident aggravated McCoy's preexisting injuries and caused new injuries. It was within the jury's province to weigh the witnesses' credibility and to resolve any conflicts in the evidence. *See Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 210 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Loomis also asserts that little evidence was offered at trial to support the award of damages for past pain and suffering. Under Texas law, the jury is given a great deal of discretion in awarding an amount of damages it deems appropriate for pain and suffering. *Moreno v. Ingram*, 454 S.W.3d 186, 195 (Tex. App.—Dallas 2014, no pet.); *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 552 (Tex. App.—Fort Worth 2006, pet. denied). "The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Tagle v. Galvan*, 155 S.W.3d 510, 518 (Tex. App.—San Antonio 2004, no pet.). "There must be some evidence to justify the amount awarded, but as long as sufficient evidence exists to support the jury's verdict, an appellate court may not substitute its

31

judgment for that of the jury." *Moreno*, 454 S.W3d at 195. "A verdict will be set aside on appeal only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive as to shock the conscience." *Id.*

At trial, McCoy testified that the steroid injections that he received in his lower back helped with the symptoms he was experiencing. He stated that, before receiving the injections, he experienced tightness and sharp pains in his back and had difficulty sleeping. The record shows that McCoy received his first steroid injection in June 2013, five months after the accident. He received his second injection in November 2013. With respect to his knee, McCoy testified that, before he had surgery, his knee would swell when he was active. The evidence showed that McCoy had surgery to treat the torn meniscus in his knee in September 2013, eight months after the accident.

Dr. Rodriguez also provided testimony relevant to the pain and suffering associated with a torn meniscus. He stated, "A meniscal tear feels usually like you have gravel in your shoes constantly. You're stepping on gravel or dirt inside the shoe or you have an eyelash in your eye all day long." Dr. Rodriguez said that patients typically complain that a torn meniscus is painful, and he recalled that McCoy had complained that he was experiencing knee pain. Dr. Rodriguez also testified that recovering from knee surgery is painful.

In addition, McCoy's medical records contained evidence relevant to his past pain and suffering. The records from the emergency room indicate that, immediately following the accident, McCoy rated his pain as 8 out of 10. Five days later, McCoy was seen by Dr. Lagesse. The records from that visit indicate that McCoy reported pain in his neck, lower back, and right knee. McCoy rated the intensity of his pain as 7 out of 10. He indicated that the pain was aggravated by walking, prolonged sitting, bending, and lifting.

McCoy saw Dr. B. Perez, a pain management specialist. Dr. Perez noted that McCoy had "pain in the neck, lower back radiating to the right leg and right knee that swells up with exertion." The doctor also noted that McCoy's "[p]ain is rated as 8/10 and is associated with numbness, tingling and weakness." McCoy reported that the "[p]ain is constant, throbbing with spasm, distressing and excruciating. It gets worse with lying down, walking, physical activity, working, bending, lifting, sitting, standing[.]" McCoy was also seen by Dr. White. McCoy told Dr. White that the pain in his lower back and knee was worsening and that he continued to have pain in his neck.

Considering and weighing all of the evidence, we conclude that the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust to support the award of $160,000 in damages for past pain and

suffering. *See Cain*, 709 S.W.2d at 176. We hold the evidence was factually sufficient to support the award.

We overrule Loomis's fourth issue.

**E.    Past Lost Earning Capacity**

In its third issue, Loomis asserts that the evidence was legally and factually insufficient to support the jury's award of $40,000 for past lost earning capacity.

Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury. *Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied); *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158–59 (Tex. App.—Amarillo 2012, pet. denied). Loss of past earning capacity is a plaintiff's diminished ability to work during the period between the injury and the date of trial. *Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 491 (Tex. App.—Amarillo 2006, no pet.).

Proof of loss of earning capacity is always uncertain and is left largely to the discretion of the jury. *Big Bird Tree Servs.*, 365 S.W.3d at 178; *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). Nevertheless, to support an award of damages for lost earning capacity, a plaintiff must present evidence sufficient to permit a jury to reasonably measure earning capacity in monetary terms. *Big Bird Tree Servs.*, 365 S.W.3d at 178; *Tagle v.*

34

*Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.); *Durham Transp. Co., Inc. v. Beettner*, 201 S.W.3d 859, 864 (Tex. App.—Waco 2006, pet. denied). Non-exclusive factors that may be considered in determining lost earning capacity include evidence of past earnings, the plaintiff's stamina, efficiency, and ability to work with pain, and the plaintiff's work-life expectancy. *Big Bird Tree Servs.*, 365 S.W.3d at 178; *Tagle*, 155 S.W.3d at 519.

At trial, McCoy's attorney asked him if he had lost wages or income "as a result of the wreck." McCoy responded that he had lost $3,000. On appeal, Loomis asserts that McCoy's testimony that he lost $3,000 in wages does not support the award of $40,000 in past lost earning capacity. Loomis's argument, however, fails to recognize that lost wages and lost earning capacity are not synonymous. Lost wages refers to the actual loss of income due to an inability to perform a specific job from the time of injury to the time of trial. *Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied). In contrast, lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury. *Id.* "[L]ost earning capacity [is] measured not by what a person actually earned before an injury, but by what the person's capacity to earn was even if he had never worked in that capacity in the past." *Scott's Marina*, 365 S.W.3d at 159.

On further questioning at trial, McCoy testified that he could make as much as $1,000 per day or nothing at all transporting cars, but he stated he averaged a thousand dollars a week. During closing argument, McCoy's attorney told the jury "[i]t took McCoy roughly ten months before he could resume full job duties." During trial, McCoy also stated that, following the accident, he was "hurting," and his knee would swell if he did too much. The evidence showed that McCoy had knee surgery in September 2013 and then attended physical therapy for his knee until October 18, 2013.

McCoy also testified that before the accident his back "was fine." He indicated that at the time of the accident it had been "peak season" for his business, and he had been "moving a lot of cars." McCoy also testified, "I am a truck driver. Either your back [is] good or bad. There isn't no in between with us. You do it every day. So if you are not right, you are going to feel it every day."

McCoy's medical records expressly indicate that he was not working in February 2013. The evidence also show that McCoy attended physical therapy two to three times per week from January 2013 until June 2013. McCoy had steroid injections in his back in June 2013 and then again in November 2013. McCoy's medical records and testimony at trial also indicated that McCoy experienced notable pain during the 10-month period, from January 2013 until November 2013, he was receiving medical care for his injuries. From this evidence, the jury could

have reasonably inferred that McCoy's capacity to earn was diminished during this 10-month period. McCoy testified that he could earn from nothing to $1,000 per day transporting cars. He stated that the average was $1,000 per week. Given the wide range in the amount he could earn, the jury could have taken McCoy's average of $1,000 per week multiplied it by 4 (the average number of weeks in a month) and then by 10 (the number of months McCoy was receiving medical care) to arrive at $ 40,000, the amount that was awarded for past lost earning capacity.

Crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the evidence would enable reasonable and fair-minded people to award $40,000 in past lost earning capacity damages. *See City of Keller*, 168 S.W.3d at 827. Furthermore, considering and weighing all of the evidence, we conclude that the evidence is not so weak to be clearly wrong and unjust. *See Francis*, 46 S.W.3d at 242. Therefore, the evidence is legally and factually sufficient to support the damages award.

We overrule Loomis's third issue.

## F. McCoy's Contributory Negligence

In its fifth issue, Loomis asserts that the evidence was factually insufficient to support the jury's determination that McCoy was not negligent. Loomis asserts, "[T]he jury's finding that Michael Hospadales was solely responsible for the

accident, and that McCoy was not contributorily negligent, was against the great weight and preponderance of the evidence."

Contributory negligence contemplates an injured person's failure to use ordinary care regarding his or her own safety. *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000). This affirmative defense requires proof that the plaintiff was negligent and that the plaintiff's negligence proximately caused his injuries. *Id.* The standards and tests for determining contributory negligence ordinarily are the same as those for determining negligence, and the rules of law applicable to the former are applicable to the latter. *Moore v. Kitsmiller*, 201 S.W.3d 147, 151 (Tex. App.—Tyler 2006, pet. denied). The burden of proof on the whole case is on the plaintiff. *Id.* However, when the issue of contributory negligence is submitted to the jury, the burden of proof is on the defendant to prove the defense by a preponderance of the evidence. *McDonald v. Dankworth*, 212 S.W.3d 336, 340 (Tex. App.—Austin 2006, no pet.).

Here, Loomis points to still snapshots extracted from the Loomis truck's onboard video system, which were offered into evidence. These snapshots show the Loomis truck, driven by Hospadales, in the left-most lane, approaching McCoy's truck and trailer, which is in the lane to Hospadales's right. As Hospadales approaches McCoy's vehicle, the tires of McCoy's truck are seen touching the white line dividing the lanes, and the tires of the trailer are shown a

bit further to the left on the line. However, McCoy's truck and trailer are never seen leaving the lane in the photographs.

On appeal, Loomis asserts that the photographs constitute "undisputed evidence" that McCoy's trailer crossed the line as Hospadales passed and hit Loomis's truck. Loomis asserts that this caused its truck to cross into McCoy's lane and hit the back of McCoy's truck. However, Loomis fails to recognize that the jury not only saw these snapshots, it also saw the video of what occurred immediately following these snapshots, it viewed the data taken from the onboard monitoring system on the Loomis truck, and it heard the testimony of McCoy's expert, Tonda.

The video shows that McCoy's truck and trailer were on the white line as Hospadales approached. The video and the data show, as he continued to approach McCoy's vehicle, Hospadales navigated the armored truck to the left, toward the shoulder. McCoy is then seen moving his truck to the right, off the white line and completely back into his own lane. The video and the data show that Hospadales moved the Loomis truck to the right. The video shows that the driver in the car in front of Hospadales's vehicle appeared to apply his brakes. The data indicates that Hospadales then pressed hard on his brakes. He was moving his truck to the right when he applied his brakes. The video shows McCoy continued to move right, entered McCoy's lane, and hit McCoy's truck. The video shows that, before he hit

39

McCoy's truck, the tires on McCoy's truck were well within McCoy's own lane. The jury could have reasonably inferred that the tires of the trailer were also within McCoy's lane and were not within Hospadales's lane immediately before the collision. The data also shows that, immediately before the accident, Hospadales had been driving the truck eight miles an hour over the speed limit. And the onboard monitoring system recorded only one impact, that being when Hospadales hit McCoy's truck.

Tonda also testified that it was his expert opinion that there had only been one impact and that was when Hospadales hit McCoy's truck in McCoy's lane. Tonda explained how the video and the data supported his opinion.

Considering and weighing all of the evidence, we conclude that the jury's finding that McCoy was not contributorily negligent is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Francis*, 46 S.W.3d at 242. We hold the evidence was factually sufficient to support the jury's finding.

We overrule Loomis's fifth issue.

## Conclusion

We affirm the judgment of the trial court.

                                              Laura Carter Higley
                                              Justice

Panel consists of Justices Keyes, Higley, and Lloyd.